IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,            )
                                 )
v.                               )        No. 3:21-CR-101-TAV-JEM
                                 )
GERARDO YAIR MUNOZ CEDILLO,       )
                                 )
            Defendant.            )

**REPORT AND RECOMMENDATION**

This case is before the Court for report and recommendation on Defendant Gerardo Yair

Munoz Cedillo's Motion to Suppress and Memorandum of Law [Doc. 19]. *See* 28 U.S.C. § 636(b).

Defendant is charged by Indictment [Doc. 3] with possession of fentanyl with intent to distribute

on July 29, 2021, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(A). This charge arises out

of the stop and search of his vehicle on that same date. Defendant moves the Court to suppress

the evidence seized from his vehicle [Doc. 19].

On July 29, 2021, Tennessee Highway Patrol ("THP") Trooper Colby Cotner stopped a

gray Porsche Cayenne, driven by Defendant Munoz Cedillo, for following too closely. Trooper

Cotner questioned Defendant inside his patrol car while preparing a traffic citation, and he asked

whether Defendant had any illegal drugs, guns, or large amounts of cash in the vehicle. While

filling out the warning citation, Trooper Cotner also asked Defendant if he could check the Vehicle

Identification Number ("VIN"). Although Defendant had been speaking with Trooper Cotner in

English, he did not understand Trooper Cotner's questions about the VIN, until the trooper pointed

to the VIN number on Defendant's registration. Trooper Cotner told Defendant he would check

the VIN before Defendant left the traffic stop. After handing Defendant the warning citation,

Trooper Cotner asked to search the vehicle several times. Defendant ultimately gave oral consent to search his vehicle.

Officers searched the Porsche and seized approximately one kilogram of fentanyl from the rear cargo compartment. Trooper Cotner arrested and handcuffed Defendant and advised Defendant of the *Miranda* warnings, using an English-to-Spanish translation application on his cellular telephone. Defendant argues the stop and search of his vehicle violated the Fourth Amendment because Trooper Cotner (1) lacked probable cause to conduct a traffic stop and (2) searched the vehicle without Defendant's voluntary consent.

After reviewing the evidence, the arguments of the parties, and the relevant law, the Court finds Trooper Cotner had probable cause to stop Defendant's vehicle for a traffic violation of following too closely and that Defendant voluntarily consented to a general search of his vehicle. The Court therefore recommends that the District Judge deny Defendant's motion to suppress.

## I. SUMMARY OF THE EVIDENCE

The parties appeared before the undersigned on April 12, 2022, for an evidentiary hearing on Defendant's motion to suppress. Assistant United States Attorney Brent Jones appeared on behalf of the Government. Attorney Joseph A. Fanduzz represented Defendant Munoz Cedillo, who was also present.

At the evidentiary hearing, the Government presented the testimony of THP Trooper Ashton Colby Cotner, who testified that he has worked for the THP for five years [Tr. p. 8].[1] Currently and in July 2021, he was assigned to the Interdiction Plus All Crimes Unit, which answers calls and investigates crimes and traffic violations occurring on interstates and highways

---

[1] The transcript of the April 12, 2022 evidentiary hearing [Doc. 29] was filed on April 19, 2022.

[*Id.*].  Trooper Cotner stated that on July 29, 2021, he was parked in the median at the number 4 mile-marker of Interstate 81 ("I-81"), when he saw a Porsche Cayenne drive past, traveling northbound in the outside lane [*Id.* at 9, 20].  Trooper Cotner said he noticed that the driver, whom he later identified as Gerardo Munoz Cedillo, had extended his arms straight out pushing himself back in his seat, was gripping the steering wheel tightly, and appeared tense [*Id.* at 9, 11].  He characterized this reaction as "fairly common" for a driver upon seeing a THP trooper [*Id.* at 11].  Trooper Cotner also noticed the vehicle had a temporary license tag from an unknown state [*Id.*].  He pulled onto the road and began following the vehicle to learn the state from which the temporary tag originated [*Id.* at 9–11].

Trooper Cotner stated that as he entered the road, he saw the Porsche get "extremely close" to the vehicle in front of it [*Id.* at 9].  According to Trooper Cotner, the Porsche was traveling at seventy (70) miles per hour and came within one car-length of the preceding vehicle, causing the Defendant to brake to keep from possibly striking the vehicle in front of it [*Id.*].  He said he calculated the Porsche's speed by keeping an equal distance from it and noting his own speed on his speedometer [*Id.* at 10].  Trooper Cotner said before spotting the Porsche, he had no information on Defendant or this vehicle [*Id.*].

Trooper Cotner testified that Defendant should have maintained one car-length of distance between his vehicle and the preceding vehicle for every ten miles per hour of his speed to create "a safe buffer zone" between vehicles [*Id.* at 12].  He said this distance was necessary to give the driver time to react if the preceding vehicle slowed suddenly [*Id.*].  Trooper Colter acknowledged that the Tennessee Code requires drivers to maintain a "reasonable distance" from the preceding vehicle but said the standard of one car-length per ten miles of speed comes from the THP's "Tennessee Crash Manual" [*Id.* at 12–13].  He stated that Defendant was one car-length or less

from the vehicle in front of him, while traveling at seventy miles per hour [*Id.* at 13]. Trooper Cotner said that based on the Tennessee Crash Manual, Defendant should have maintained seven[2] car-lengths of distance for a speed of seventy miles per hour [*Id.*] He identified a one-minute video clip of the Defendant's vehicle, which was recorded by the outward facing dash camera in his patrol car and which was played for the Court [*Id.* at 20; Exh. 1, clip 1].

Trooper Cotner stated that he activated his lights and siren and stopped the Porsche [*Id.*]. Trooper Cotner approached the vehicle on the passenger side, observing that Defendant was the sole occupant [*Id.*]. Defendant lowered the passenger window, and Trooper Cotner explained the reason for the stop and asked for Defendant's driver's license, registration, and proof of insurance [*Id.* at 14]. Trooper Cotner said Defendant provided an identification card, the registration, and a laminated insurance policy, but no driver's license [*Id.*]. Trooper Cotner said this was the first time in eight years of law enforcement that he was given a laminated insurance policy [*Id.*]. He asked Defendant to get out of the vehicle so he could issue a warning citation [*Id.*]. Trooper Cotner testified that, after Defendant got out of his vehicle, he told Defendant, "if you'd like, you can s[i]t in my passenger seat" because the THP has a "policy during investigative stops that we can have someone sit in our front seat" where there is a camera recording the passenger [*Id.* at 15].

Trooper Cotner testified that once he and Defendant were inside the patrol car, he asked Defendant questions about his trip, such as asking about his destination and point of departure [*Id.*]. Trooper Cotner said he does not speak Spanish and spoke to Defendant in English [*Id.*]. He said Defendant gave "clear, precise answers" to his questions about Defendant's itinerary [*Id.*].

---

[2] The transcript states that Trooper Cotner responded to AUSA Jones's question on the reasonable number of car lengths between vehicles as "70, 70 miles per hour" [Tr. p. 13]. The Court finds this to be an error in the transcript. The recording of Trooper Cotner's testimony reveals that Trooper Cotner responded "seven at seventy miles per hour."

4

According to Trooper Cotner, the first thing he did upon entering the patrol car was perform a computer check for warrants [*Id.* at 16].  He also performed a check on the temporary license tag because he had not received results from his prior radio call on the tag [*Id.* at 16–17].  Trooper Cotner asked Defendant for his address for the warning citation, and Defendant responded that he was from New York [*Id.* at 17].  Trooper Cotner noted that this differed from Defendant's identification which was from outside the United States [*Id.*].  He said he completed the warning citation and asked Defendant whether he had any narcotics, guns, or currency [*Id.*].

Trooper Cotner said, because he had not received information on the temporary license tag, he decided to verify that the temporary tag was issued to this vehicle by checking the VIN number on the insurance papers against the VIN on the door of the vehicle, after he gained consent [*Id.*].  Trooper Cotner said he asked Defendant for consent to search the vehicle so he could verify the vehicle's VIN to confirm the vehicle was not stolen [*Id.* at 17–18].  Trooper Cotner agreed that he also suspected Defendant was trafficking drugs because the Defendant was taking a trip after working one week, was "standoffish" about his work, and acted like he did not understand what Trooper Cotner was saying with regard to the "short trip" [*Id.* at 18].  Trooper Cotner said the temporary tag and laminated insurance paper contributed to his suspicion [*Id.*].

Trooper Cotner's testimony was that he asked for consent to search Defendant's vehicle in several different ways to make sure Defendant fully understood the question [*Id.* at 18–19].  Trooper Cotner believed Defendant understood he was giving consent [*Id.* at 19].

Trooper Cotner identified a forty-five-minute video recording from his body camera, and the Government played the first five minutes and fifteen seconds of the recording, showing the trooper's interaction with Defendant after the stop until shortly after Defendant entered the patrol

5

car [*Id.* at 20–21, Exh. 1, clip 3].    The Government also played an eleven-minute, one second recording from the camera facing the front passenger seat [*Id.* at 21; Exh. 1, clip 2].[3]

Trooper Cotner testified that after Defendant consented to the search, he opened the driver's door and checked the VIN sticker inside the door seam [Tr. p. 21–22].  He checked the sticker to confirm it was not a "lay over sticker," commonly found on stolen vehicles [*Id.* at 22].  Trooper Cotner also looked at the VIN plate on the dash, which had a piece of paper covering it [*Id.* at 21–22].  He then searched under the seat, in the center console, and under the hood [*Id.* at 22].  Trooper Cotner looked under the hood to compare that VIN with the other VINs to make sure "it was not a VIN swap situation" [*Id.*].    Trooper Cotner said he was not able to identify the vehicle's VIN [*Id.*].

Trooper Cotner testified that other troopers arrived on the scene to assist with the search [*Id.* at 23].  He said that while he was attempting to use an OBD2 scanner, which connects to the vehicle's computer underneath the dash, to verify the VIN, another trooper found some controlled substances in the trunk in the spare tire storage area [*Id.* at 23–25].  Trooper Cotner said the OBD2 scanner plugs into most vehicles, allowing him to directly access the vehicle's computer mainframe, scroll through the vehicle's database, and access the vehicle's VIN [*Id.* at 24].  He said the OBD2 scanner did not work on the Defendant's vehicle [*Id.* at 24].

The Government played the video recording from Trooper Cotner's body camera from the thirty-five-minute mark to the forty-minute-and-forty-second mark [*Id.* at 25; Exh. 1, clip 3].  Trooper Cotner testified that after drugs were discovered in the vehicle, he arrested Defendant for having an illegal substance and advised him of the *Miranda* rights [Tr. p. 25–26].  When Trooper

---

[3]      The Government called the recording from inside the patrol car the "third clip" at the hearing, but the clip is labeled "SCH11 (2)" and is the second clip on Exhibit 1.  The Court will cite to this portion of Exhibit 1 as clip 2.

6

Cotner asked Defendant if he understood the *Miranda* rights, Defendant replied that he did not, so Trooper Cotner used the Google translate application on his cellphone to translate the advice of rights into Spanish [*Id.* at 26]. Trooper Cotner said he used the application because "[a]t that time I just believed that he didn't understand what . . . *Miranda* rights meant . . . [in that] he didn't understand what they were as far as the word *Miranda*" [*Id.*]. Trooper Cotner stated he used the translation application to be sure Defendant "completely understood every word I was saying of *Miranda*" [*Id.*]. He agreed that following the *Miranda* warning, Defendant did not confess to possessing fentanyl or to any other crime [*Id.* at 27]. Defendant was transported to Jefferson County Jail, where he was booked and his personal belongings were seized [Doc. 21 p. 5].

On cross-examination, Trooper Cotner testified that he stopped Defendant's vehicle for following too closely [Tr. p. 28]. He agreed that while pacing Defendant's car, he was looking down at his speedometer, monitoring Defendant's position in relation to him, and assessing how close Defendant was to the preceding vehicle [*Id.* at 30]. He also agreed that it is normal for vehicles to slow down upon observing a law enforcement officer [*Id.* at 31]. He stated that in the ten seconds he followed Defendant's vehicle, Defendant's driving was unreasonable [*Id.* at 32].

Trooper Cotner said that after another officer located drugs in Defendant's vehicle, he examined the suspected drugs [*Id.* at 32]. Based on the packaging, the appearance of the substance, and his training and experience, he then detained Defendant [*Id.*]. Trooper Cotner agreed that after beginning to advise Defendant of the *Miranda* rights in English, he believed Defendant did not understand what *Miranda* was, so he used the Google translation application [*Id.* at 33]. He agreed that he confirmed Defendant spoke Spanish and that Defendant previously said he only understood "some words" [*Id.* at 33, 37]. Trooper Cotner, however, acknowledged that he did not use the Google translation application until after the search of Defendant's vehicle [*Id.*].

7

Trooper Cotner agreed he did not ask whether Defendant spoke Spanish at the time he requested consent to search the vehicle [*Id.* at 33]. He acknowledged that he assumed Defendant spoke Spanish because he used some Spanish words in communicating with Defendant [*Id.* at 34]. He also agreed that he had interacted with Defendant for about twenty minutes at the time he asked for consent to search the vehicle and that, during that time, Defendant sometimes did not understand him [*Id.*]

Trooper Cotner stated that when he first approached Defendant's vehicle and spoke with Defendant, he believed Defendant understood him [*Id.* at 35]. He agreed he knew Defendant was not from the United States and that he had to ask Defendant about three times to whom the vehicle belonged [*Id.*]. Trooper Cotner agreed that Defendant brought his cellphone to the patrol car even though he told Defendant he would not need it [*Id.* at 37]. He agreed that at one point in their conversation, Defendant said his English was bad [*Id.* at 38]. Trooper Cotner acknowledged that Defendant did not understand his remark that working inside was cooler and that he had to explain to Defendant the difference between a ticket and a warning citation several times [*Id.* at 39, 40].

Upon questioning by defense counsel, Trooper Cotner agreed that Defendant understood the trooper was talking about the VIN number on the paperwork only after he pointed to the VIN number [*Id.* at 41]. He said he asked Defendant for consent to search several times to be sure Defendant was giving consent [*Id.*]. He said he made it clear that he would be searching Defendant's vehicle, and Defendant gave consent to search [*Id.* at 42]. Trooper Cotner said he did not believe it was necessary to use the Google translation application when he was asking Defendant for consent to search his vehicle [*Id.* at 42]. He further agreed that while asking for consent to search, he did not ask if Defendant understood what he was saying [*Id.* at 43]. He

8

agreed he did not give Defendant a consent waiver in Spanish or explain to Defendant that he had the right to refuse consent [*Id.*].

Upon hearing this evidence and the parties' arguments on the motion, the Court took the matter under advisement.

## II.    FINDINGS OF FACT

Based upon the testimony of Trooper Cotner and the exhibits, the Court makes the following factual findings: On July 29, 2021, Trooper Cotner was on patrol in the median on I-81 observing traffic in the northbound lane, when a Porsche Cayenne with a temporary tag passed him. Curious about the temporary tag, Trooper Cotner pulled onto the road and followed the Porsche. Trooper Cotner matched his speed to that of the Porsche and determined the vehicle was traveling at seventy miles per hour. He then saw the Porsche come within one car-length of the preceding vehicle and brake. Trooper Cotner activated his lights and siren and stopped the Porsche for following too closely.

Trooper Cotner approached the vehicle on the passenger side and spoke to the driver and sole occupant of the car, whom he identified as Gerardo Munoz Cedillo, the Defendant in this case. Trooper Cotner told Defendant that he stopped him for following too closely and intended to write a warning citation. Trooper Cotner requested Defendant's license, registration, and proof of insurance. Defendant provided a Mexican identification card, his registration, and a laminated insurance document. Trooper Cotner then directed Defendant to get out of his vehicle so he could write the citation. When Defendant met Trooper Cotner behind the Porsche, Trooper Cotner lightly patted Defendant's pockets, then directed Defendant to sit in the front passenger seat of his patrol car so they could hear each other.

9

After entering the patrol car, Trooper Cotner checked for outstanding warrants and began filling out the warning citation. He asked Defendant questions about his itinerary, his employment, and the vehicle. About twelve minutes after entering the patrol car, Trooper Cotner asked Defendant if he had any marijuana, cocaine, heroin, or methamphetamine, and Defendant denied having each substance [Exh. 1, clip 2, 5:26–5:43]. After about fifteen minutes in the patrol car, Trooper Cotner asked Defendant if he could check the vehicle's VIN [Exh. 1, clip 2, 8:29]. Defendant did not understand the question, and Trooper Cotner pointed to the VIN on the paperwork. Trooper Cotner told Defendant that before he allowed Defendant to leave, he was going to check the VIN in the car to confirm it matched the VIN on the paperwork [Exh. 1, clip 3, 8:37]. Defendant responded, "No problem" [Exh. 1, clip 2, 8:41]. In response to Trooper Cotner's questions, Defendant denied having any guns or money belonging to someone else in his vehicle and stated that the car contained his tools [Exh. 1, clip 2, 9:10–9:20]. Trooper Cotner then explained the warning citation to Defendant, gave Defendant the warning citation, and returned his identification [Exh. 1, clip 2, 9:33].

As Defendant was preparing to exit the patrol car, Trooper Cotner asked if Defendant was "ok with a search?" [Exh. 1, clip 2, 9:47]. Defendant responded that he was "ok," although he had never been inside a police car before, and he thanked the trooper for his assistance [Exh. 1, clip 2, 9:48]. Trooper Cotner asked again if Defendant was "ok if I ask to search the vehicle?" [Exh. 1, clip 2, 9:57]. Defendant responded that his vehicle was "ok" but that he might have to get gasoline, because of the twelve-hour drive [Exh. 1, clip 2, 9:59]. Trooper Cotner then said, "Let me ask you this, to make sure that your story matches that you're only here for work, are you ok with me to look inside the vehicle? Are you ok with that?" [Exh. 1, clip 2, 10:06]. Defendant replied, "Yes, sir. Yes, sir." [Exh. 1, clip 2, 10:16]. Then, Trooper Cotner said, "Here's what I'm going to do.

Verify the VIN and stuff," to which Defendant responded, "The VIN number?" [Exh. 1, clip 2, 10:20]. Trooper Cotner said, "Yeah, and look inside," and Defendant said that he had checked "everything" at the time he purchased the vehicle [Exh. 1, clip 2, 10:22]. Trooper Cotner asked a fourth time, "But you're good with a search? You're good with me searching?" and Defendant said, "Yes, sir" [Exh. 1, clip 2, 10:28]. Trooper Cotner then asked Defendant to get out of the patrol car and wait beside it.

While Trooper Cotner attempted to verify the Porsche's VIN, other troopers searched the car and found suspected controlled substances in the spare tire storage area. Trooper Cotner arrested Defendant and attempted to advise him of the *Miranda* rights. When Defendant said he did not understand, Trooper Cotner used a translation application on his cellular telephone to translate the *Miranda* warnings into Spanish.

## III.    ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Defendant Munoz Cedillo argues that law enforcement violated his rights under the Fourth Amendment because Trooper Cotner lacked probable cause to stop him for a traffic violation and searched his vehicle without his valid consent. The Court finds that Trooper Cotner had probable cause to stop Defendant for following too closely and searched Defendant's vehicle pursuant to Defendant's valid consent.

### A.    Propriety of Traffic Stop

Defendant argues that Trooper Cotner lacked probable cause to stop his vehicle. He asserts that, based upon the brief time that Trooper Cotner followed his vehicle and the angle of Trooper Cotner's view, Trooper Cotner could not accurately assess how close Defendant was to the preceding vehicle. In addition, Defendant contends it was a clear, dry day, and he was traveling

at a reasonable speed and in the flow of traffic. Defendant asserts that as Trooper Cotner approached, the vehicle in front of Defendant slowed down, possibly because it noticed Trooper Cotner's patrol car, and Defendant had to apply his brakes. He maintains that his driving was reasonable for the circumstances, and the trooper did not have a basis to stop him.

The Government counters that Trooper Cotner had probable cause to stop Defendant for a violation of Tennessee Code Annotated § 55-8-124(a), following too closely. It contends that Trooper Cotner observed Defendant's vehicle at a distance of one car length or less behind another vehicle, while traveling at seventy miles per hour. It asserts that the twenty-second video recording from Trooper Cotner's dash camera reveals that Defendant was much less than four seconds away from the preceding vehicle.

If an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993), *cert. denied*, 513 U.S. 828 (1994). To determine whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment, the Court objectively evaluates the officer's conduct in light of the surrounding circumstances known to the officer. *Id.* at 388; *see Whren v. United States*, 517 U.S. 806, 810 (1996). Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). In other words, probable cause means a substantial chance or likelihood of criminal conduct. *Ferguson*, 8 F.3d at 392 (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)). A stop based on probable cause that a traffic violation has occurred is reasonable, without regard to the officer's subjective motives. *Whren*, 517 U.S. at 813; *Ferguson*, 8 F.3d at 391.

Under Tennessee state law, "[t]he driver of a motor vehicle shall not follow another vehicle more closely than reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and condition of the highway." Tenn. Code Ann. § 55-8-124(a). The Sixth Circuit Court of Appeals has recently examined "what constitutes a 'reasonable and prudent' following distance." *United States v. Howard*, 815 F. App'x 69, 73–74 (6th Cir. 2020). Observing that Tennessee state courts have not defined "reasonable and prudent," the appellate court relied on the Tennessee Comprehensive Driver License Manual ("Manual") to guide its analysis. *Id.* at 74 (citing Tenn. Dep't of Safety & Homeland Sec'y, Tennessee Comprehensive Driver License Manual 48–49 (July 1, 2018 ed.)); *United States v. Collazo*, 818 F.3d 247, 255 (6th Cir.), *cert. denied*, 137 S. Ct. 247 (2016). Prior to 2010, the Manual instructed drivers to maintain one car-length of distance for every ten miles per hour of speed. *Howard*, 815 F. App'x at 74; *Collazo*, 818 F.3d at 255. After 2010, the Manual "define[s] a safe following distance in terms of seconds rather than car lengths," providing that "drivers should generally maintain a following distance of at least two seconds" behind the preceding vehicle. *Howard*, 815 F. App'x at 74. "During 'interstate highway driving at higher speeds,' however, drivers should maintain a following distance of '[a] minimum of four seconds.'" *Id.* (quoting Manual at 49). The court recognized that it has used both standards in its decisions. *Id.* Although the rules from both editions of the Manual are not binding as to what constitutes a "reasonable and prudent" following distance, our appellate court has found them to "operate as valuable guideposts when determining whether an officer possessed probable cause to stop a vehicle for violating § 55-8-124(a)." *Collazo*, 818 F.3d at 255–56.

Here, Trooper Cotner testified that he paced the Defendant's vehicle traveling at seventy (70) miles per hour and observed that the Porsche was one car length or less behind the preceding

vehicle. Trooper Cotner testified that Defendant had to apply his brakes to keep from striking the vehicle in front of him. The video recording from Trooper Cotner's dash camera reveals that Defendant's car was traveling approximately one second behind the car in front of it. Accordingly, under either the standard from the pre-2010 Manual or the standard from the 2010 Manual, Defendant was closer to the preceding vehicle than was reasonable and prudent. The evidence presented at the evidentiary hearing supports Trooper Cotner's determination that Defendant was following too closely.

Defendant's arguments do not persuade the Court that that he maintained a reasonable and prudent distance from the other vehicle. Based on the evidence presented at the evidentiary hearing and the standard from the Tennessee Comprehensive Driver License Manual, Defendant was traveling more than twice as close, either by time or distance, to the car in front of him. While the video recording from Trooper Cotner's dash camera does not reveal that the white car in front of Defendant applied its brakes, the Court finds that Defendant was closer than reasonable and prudent for the circumstances, even if the preceding vehicle slowed.

The Court finds that Trooper Cotner had probable cause to believe the Porsche was following too closely to the vehicle in front of it. Thus, Trooper Cotner's stop of Defendant's vehicle comports with the Fourth Amendment.

**B.     Validity of Consent**

Defendant argues that he did not knowingly and voluntarily consent to the search of his car. He asserts that the Government bears the burden of demonstrating that his consent was voluntary and that this burden is heavier when the individual does not readily speak or understand English. Defendant contends that English is not his native language and that his actions and statements on the video recording of the traffic stop reveal he did not understand the trooper's

14

request to search. He maintains that the video recording shows numerous instances prior to the request for consent where he did not understand the trooper's questions or statements: The trooper had to ask the same questions repeatedly; Defendant told Trooper Cotner he only understood "some words" in English; and Defendant affirmatively stated he did not understand what the trooper was talking about while in the vehicle. Defendant also argues that Trooper Cotner asked for consent several times and that, when Defendant gave consent, he only consented to the trooper checking the VIN. Although Defendant concedes Trooper Cotner was not overtly coercive, he maintains that the trooper's request for consent was vague and deceptive. Finally, Defendant argues that the trooper's use of the translation application when giving the *Miranda* warnings further underscores that Defendant did not readily understand when Trooper Cotner asked him for consent to search his vehicle in English. Defendant asks the Court to suppress the evidence seized from his vehicle on July 29, 2021, because it was seized without a warrant and without his voluntary consent.

The Government counters the totality of the circumstances show that Defendant knowingly and voluntarily agreed to the search of his vehicle. It contends the thirty-two-year-old Defendant conversed intelligently with Trooper Cotner in English before and after entering the patrol car. Defendant responded appropriately to the trooper's request for his documents and talked responsively with Trooper Cotner about his trip and his employment. The Government acknowledged that Trooper Cotner had to explain some matters to Defendant but asserts that Defendant responded appropriately once the terms were explained and that Defendant's demeanor in the patrol car shows that the situation was not coercive. It maintains the circumstances as a whole show that Defendant unequivocally gave consent to the trooper's request to look in his vehicle.

An individual's voluntary consent to a search is an exception to the warrant requirement of the Fourth Amendment. A valid search may be made without a warrant and without probable cause if the person voluntarily consents to the search. *Schneckloth v. Bustamante*, 412 U.S. 218, 219, 228–29 (1973); *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011). The applicability of this exception is evaluated by examining the totality of the circumstances, with the burden resting on the government to prove both actual consent and its voluntary nature. *United States v. Scott*, 578 F.2d 1186, 1188–89 (6th Cir.), *cert. denied*, 439 U.S. 870 (1978). The government must make this showing through "clear and positive testimony" and to a preponderance of the evidence. *United States v. Hinojosa*, 606 F.3d 875, 881 (6th Cir. 2010); *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999).

"Consent to a search must be voluntary and free of duress or coercion, express or implied." *United States v. Thomas*, 662 F. App'x 391, 395 (6th Cir. 2016) (citing *Bustamante*, 412 U.S. at 248); *cert. denied* 137 S. Ct. 1599 (2017); *Worley*, 193 F.3d at 386 (requiring that consent to search be "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion"). In determining whether consent was voluntary, the Court considers the totality of the circumstances, including the "characteristics" of the consenting individual, such as (1) the individual's age, intelligence, and education level; (2) whether the individual understood he had the right to decline to consent; and (3) whether the individual understood his constitutional rights. *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998). The Court also considers the "details of the detention," such as (4) the nature and duration of the detention; (5) whether law enforcement used coercive or punitive conduct; and (6) any "indications of 'more subtle forms of coercion that might flaw [an individual's] judgement.'" *Id.* (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)); *see also Worley*, 193 F.3d at 386.

Although the Court finds that Trooper Cotner did not have probable cause to search the rear cargo area of Defendant's vehicle absent Defendant's consent, the undersigned recommends that the District Judge deny the suppression motion because Defendant voluntarily consented to a general search of his vehicle.

### 1. Voluntariness of Consent

The Court first examines whether Defendant knowingly and voluntarily consented to the search of the vehicle. As stated above, the Court looks to the characteristics of the Defendant and the circumstances of the detention, in assessing whether the totality of the circumstances indicate consent was voluntary. *Ivy*, 165 F.3d at 402.

Turning first to Defendant's characteristics, the Court finds nothing about Defendant's age or intelligence indicate that he could not voluntarily consent to a search of the vehicle. English, however, is not Defendant's native language, and he argues that the record reveals that he did not understand Trooper Cotner's request for consent. "A language barrier is a factor to consider when determining the validity of consent." *United States v. Reyes-Martinez*, 1:17-CR-00035-GNS-2, 2020 WL 7379141, at *4 (W.D. Ky. Sept. 25, 2020) (Report & Recommendation), *adopted by*, 2020 WL 6820800 (W.D. Ky. Nov. 20, 2020); *see also United States v. Lopez-Uquiza*, No. 1:10–cr–151, 2011 WL 1841679 (E.D. Tenn. May 13, 2011) (Collier, J.). In this respect, the government has a "heavier" burden of demonstrating consent was voluntary when the individual "is a foreigner who does not readily speak and understand English." *Reyes-Martinez*, 2020 WL 7379141, at *4 (citing *Kovach v. United States*, 53 F.2d 639, 639 (6th Cir. 1931) (per curiam)). "'In determining whether an individual has sufficient comprehension of English to provide voluntary consent, courts examine his ability to interact intelligently with the police.'"

*United States v. Valdez*, 147 F. App'x 591, 596 (6th Cir. 2005) (quoting *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999)).

Here, Defendant and Trooper Cotner conversed in English for more than twenty minutes before Trooper Cotner requested consent. Although Defendant did not understand some statements and questions by the trooper, he gave Trooper Cotner his identification, registration, and proof of insurance upon request and answered questions about his itinerary. *See id.* (observing that defendant readily provided his license at the officer's request and appropriately responded to the officer's questions about his travels and relationship to the passenger); *Reyes-Martinez*, 2020 WL 7379141, at *4 (finding defendants' language barrier did not prevent their voluntary consent where they responded appropriately in English to the trooper's questions and request for documentation); *United States v. Singh*, No. 3:18-CR-180-CRS, 2019 WL 2783564, at *3 (W.D. Ky. 2019) (finding that although defendant had an accent, he "appear[ed] to understand the officer's commands and questions and answer[ed] with little hesitation in clearly understandable English"); *Lopez-Urquiza*, 2011 WL 1841679, at *5 (determining upon review of the video recording of the traffic stop that despite defendant's "heavy accent," defendant "understood the majority of [the officer's] questions"); *see also United States v. Zuniga*, 613 F. App'x 501, 508 (6th Cir. 2015) (finding defendant's responses in English to the officer's questions and request for documents indicated consent was voluntary). Defendant Munoz discussed his work installing windows with Trooper Cotner and explained to the trooper his difficulty in renewing his driver's license due to the closure of the Department of Motor Vehicles in New York. Upon review of the video recording, the undersigned finds the video recording shows Defendant understood "a good bit of English." *Valdez*, 147 F. App'x at 596 (determining the district court's finding that "it's

18

clear to me from watching this videotape that [the defendant] understands a good bit of English" was not clearly erroneous).

The Court also finds that Trooper Cotner repeatedly asked Defendant for consent to search in order to assure that Defendant understood what he was asking. When Defendant's answers to Trooper Cotner's first two requests for consent were unresponsive, the trooper asked to "look inside the vehicle" in order "to make sure that your story matches that you're only here for work" [Exh. 1, clip 2, 10:06]. Defendant agreed. Trooper Cotner then said, he would "verify the VIN and stuff . . . and look inside" [Exh. 1, clip 2, 10:20–22]. When Defendant responded that he had checked "everything" in the car when he purchased it, Trooper Cotner asked a fourth time, "But you're good with a search? You're good with me searching?" and Defendant said, "Yes, sir" [Exh. 1, clip 2, 10:28]. Thus, before searching the vehicle, Trooper Cotner had requested consent multiple times, and Defendant had agreed to a search at least twice. *See United States v. Mariscal*, No. 2:18-CR-112, 2019 WL 3368923, *4–5 (E.D. Tenn. Mar. 8, 2019) (finding Spanish-speaking defendant, who responded affirmatively to the trooper's repeated requests for consent, gave voluntary and unequivocal consent to search her vehicle) (Report & Recommendation), *adopted by*, 2019 WL 2571585 (E.D. Tenn. June 21, 2019) (Reeves, J.). The Court also finds request for consent came over a thirty-second period at the end of the traffic stop. In other words, this was not a case of Trooper Cotner persistently requesting consent in order to wear Defendant down. *Cf. United States v. Alvarado*, No. 16-20748, 2017 WL 2438787, at *6 (E.D. Mich. June 6, 2017) (holding consent not voluntary where armed agents awakened defendants before midnight and repeatedly asked for consent to search their home, in different ways, over a twenty-minute period).

Although not determinative, Trooper Cotner never informed Defendant that he could refuse consent. *See United States v. Drayton*, 536 U.S. 194, 206–07 (2002) (observing that an officer's

failure to notify defendant that he could refuse consent is only one factor in the totality of the circumstances); *see also Bustamonte*, 412 U.S. at 234 (rejecting "proof of knowledge of a right to refuse as the sine qua non of an effective consent to search").   Additionally, Defendant's subsequent failure to understand the *Miranda* warnings indicates he was not familiar with his constitutional rights.   Yet, the Court's review of the video recordings shows that Defendant conversed with Trooper Cotner in English on multiple topics and asked questions or indicated when he did not understand something.   The Court finds that Defendant's language barrier was not an impediment to his voluntary consent.

The Court also considers the circumstances of Defendant's detention, such as the nature and duration of the detention and the presence of any police coercion, whether overt or subtle.  *Ivy*, 165 F.3d at 402.  As for the duration of the stop, Defendant was detained approximately twenty minutes from the time Trooper Cotner approached his vehicle to the time the trooper requested consent, and during this time, Trooper Cotner was collecting information and preparing the warning citation.[4]  The Court finds the duration of the stop was not coercive.  *See Howard*, 815 F. App'x at 79 (finding that traffic stop lasting twenty-six minutes was not coercive); *Lopez-Urquiza*, 2011 WL 1841679, at *5 (finding sixteen to eighteen minute stop was not coercive); *United States v. Guajardo*, 388 F. App'x 483, 490 (6th Cir. 2010) (affirming that twenty-five-minute stop to

---

[4]    The video recordings reveal Trooper Cotner was performing computer checks on Defendant's information and working on the warning citation throughout the stop.  Although Trooper Cotner asked questions about illegal drugs or firearms in the vehicle, he did not abandon the traffic stop to investigate drug trafficking.  *See United States v. Whitley*, ___ F.4th ___, 2022 WL 1561329, at *5 (6th Cir. May 18, 2022).  Our appellate court has held that during the "'dead time'" while the officer is completing tasks attendant to the traffic stop, the "'officer may ask unrelated questions to his heart's content.'"  *Id.* (citing *United States v. Howard*, 815 F. App'x 69, 75 (6th Cir. 2020)).

investigate whether driver was impaired was reasonable in duration and "reasonably related in scope to the circumstances of the stop").

Although the subject of a traffic stop is detained, typically "'the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute" custody requiring the provision of the *Miranda* warnings. *Howes v. Fields*, 565 U.S. 499, 509 (1994); *Berkemer v. McCarty*, 468 U.S. 420, 437, 440 (1984) (holding a defendant subject to a traffic stop "is not 'in custody' for the purposes of *Miranda*" because a traffic stop is akin to an investigatory detention); *Howard*, 815 F. App'x at 79 (finding that questioning defendant outside of his vehicle by side of the road, without any physical restraints, and with a friendly tone was not coercive and did not require *Miranda* warnings). An officer may order an individual to sit inside his patrol car while the tasks necessary to the traffic stop are ongoing. *United States v. Bradshaw*, 102 F.3d 204, 212 (6th Cir. 1996) (holding defendant's detention in the patrol car while the officer awaited the dispatcher's check of defendant's driver's license and vehicle registration was "well within the bounds of the initial [traffic] stop . . . [and] a legitimate exercise of valid routine police procedure"), *cert. denied*, 520 U.S. 1178 (1997); *see also United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008) (following traffic stop for excessive window tint, defendant directed to sit in back of patrol car while police verified his identity); *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999) (finding officer "lawfully asked defendant to sit in the squad car while he wrote a courtesy citation and performed record checks of his driver's license and registration"); *United States v. Betancourt*, No. 3:18-cr-087, 2019 WL 2928888, at *5 (S.D. Ohio July 8, 2019) ("[O]fficers may ask a driver to sit in a cruiser during the completion of the traffic investigation and citation process.").

Placing a detained individual inside a police car does, however, heighten the custodial nature of the detention. *United States v. Richardson*, 949 F.2d 851, 857–58 (6th Cir. 1991)

(holding that placing the suspect into the back seat of a patrol car and continuing to question him, after he declined consent to search his car, transformed a *Terry* stop into an arrest); *Bradshaw*, 102 F.3d at 211–12 (reasoning that "[d]etention in a police car does not automatically constitute an arrest" but may do so when the detention exceeds "the purpose and objective of the stop"). Requiring a defendant to sit in the front passenger seat of a patrol car and answer questions while the officer fills out the traffic citation can also raise the level of custody beyond that of a typical traffic stop. *United States v. Brown*, No. 3:19-CR-191-TAV-HBG, 2021 WL 6545270, at *15 (E.D. Tenn. Dec. 22, 2021) (finding questioning of defendant on front passenger seat of the patrol car while officer entered information into his in-car computer "raised the level of custody beyond that of a typical traffic or *Terry* stop") (Report & Recommendation), *adopted by*, 2022 WL 164534 (E.D. Tenn. Jan. 18, 2022) (Varlan, J.); *United States v. Wanda Hayes & Patrick Carney*, No. 3:19-CR-73-TAV-HBG, 2020 WL 4034309, at *18 (E.D. Tenn. Feb. 21, 2020) (finding that "placing a detained individual inside a police car [during traffic stop] heightens the custodial nature of the detention") (Report & Recommendation), *adopted on other grounds by*, 458 F. Supp. 3d 857 (2020) (Varlan, J.). *Cf. Thomas*, 662 F. App'x at 395 (analyzing defendant's placement in back of patrol car during traffic stop as but one of the circumstances of defendant's consent to search). But "the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *Watson*, 423 U.S. at 424 (analyzing consent to search car given after defendant was removed from restaurant, arrested, and provided the *Miranda* warnings but while defendant was on the street outside the restaurant).

In this case, the Court finds that the location of the detention inside the patrol car did not impact the voluntariness of Defendant's consent. While Defendant twice remarked that he had never been inside a police car before, Defendant did not seem unduly nervous or stressed.

Defendant spoke amiably with the trooper and initiated questions about the effect of the warning citation on his driver's license renewal. Trooper Cotner was polite and spoke cordially to Defendant. *See Reyes-Martinez*, 2020 WL 7379141, at *4 (observing that trooper was polite and finding consent was voluntary despite language barrier). Additionally, the Court observes that Defendant twice agreed to a search of his vehicle without hesitation or limitation. *See Thomas*, 662 F. App'x at 395 (observing that although defendant was seated in the back of the police car, he consented to a search of his vehicle's trunk "without hesitation," following advice of *Miranda* rights); *see, e.g.*, *Mariscal*, 2019 WL 3368923, *1–2, *4 (finding Spanish-speaking defendant, seated in front of patrol car while officer wrote out citation, voluntarily consented to a search of her vehicle).

At the April 12 hearing, Defendant conceded and the Court finds that Trooper Cotner did not engage in any overt coercive or punitive conduct. As for subtle forms of coercion, when evaluating the totality of the circumstances surrounding consent to search, "account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Bustamonte*, 412 U.S. at 229. In this regard, the Court finds that Trooper Cotner's questions were somewhat disjointed, switching between topics. In contrast, the Court observes that in other cases, the court emphasized that the officer speaking to a non-native speaker used simple terms. *Reyes-Martinez*, 2020 WL 7379141, at *4 (observing that although the officer spoke in English, he used simple terms and used a few Spanish words). Even so, Trooper Cotner's questions do not appear to have been calculated to take advantage of the language barrier. *Lopez-Uquiza*, No. 1:10–cr–151, 2011 WL 1841182, at *8 (observing "the video of the stop shows defendant was able to converse in English with [the officer]" and "was not tricked, deceived, coerced or threatened into giving consent") (E.D. Tenn. Mar. 14, 2011) (Report and

23

Recommendation), *adopted in part by* 2011 WL 1841679 (E.D. Tenn. May 13, 2011) (Collier, J.). Trooper Cotner repeated questions that Defendant indicated he did not understand and testified that he asked for consent to search the vehicle several different ways to be sure that Defendant understood the question asked of him.

Considering the totality of the circumstances, the Court finds despite Defendant's language barrier, Defendant voluntarily consented to the search.

### 2.      Scope of Consent

Defendant argues that if he consented to a search, his consent was limited to checking the vehicle's VIN. When consent forms the basis for a warrantless search, the scope of the search is limited by the scope of the consent. *United States v. Garrido-Santana*, 360 F.3d 565, 574 (6th Cir.), *cert. denied*, 542 U.S. 945 (2004). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251, (1991); *United States v. Caudill*, 25 F. App'x 349, 354 (6th Cir. 2001). The scope of an individual's consent is determined from the conversation at the time consent is given. *Id.* "The scope of a search is generally defined by its expressed object." *Jimeno*, 500 U.S. at 251; *United States v. Henry*, 429 F.3d 603, 616 (6th Cir. 2005). When an officer told a defendant he was looking for drugs in a car, the Supreme Court held it was "objectively reasonable for the police to conclude that the general consent to search [the defendant's] car included consent to search containers within that car which might bear drugs." *Jimeno*, 500 U.S. at 251.

The video recording shows that while working on the warning citation, Trooper Cotner asked Defendant whether he had any marijuana, cocaine, heroin, or methamphetamine, and

Defendant denied having each [Exh. 1, clip 2, 5:26–43]. Approximately three minutes later, Trooper Cotner discussed the vehicle's VIN with Defendant and told Defendant that before Defendant left, he would check the VIN on the vehicle to confirm it matched the VIN on Defendant's paperwork [Exh. 1, clip 2, 8:29–37]. Defendant affirmed he had no problem with a check of the VIN [Exh. 1, clip 2, 8:41]. Approximately thirty seconds later, Trooper Cotner asked Defendant if he had any "pistoles" or guns of any kind in his vehicle or any money that belonged to someone else [Exh. 1, clip 2, 9:10–20]. Defendant denied having these items, stating the car contained his tools and gloves [*Id.*]. Less than thirty seconds later, as Defendant was preparing to get out of the patrol car, Trooper Cotner twice asked if Defendant was "ok with a search?" and "ok . . . to search the vehicle" [Exh. 1, clip 2, 9:47 & 9:57]. Defendant twice answered Trooper Cotner's general request for consent to search with nonresponsive answers, that he personally was "ok" and that his vehicle was "ok" to continue his trip, although he would need to stop for gasoline [Exh. 1, clip 2, 9:48 & 9:59].

Trooper Cotner then asked for consent a third time, stating "Let me ask you this, to make sure that your story matches that you're only here for work, are you ok with me to look inside the vehicle? Are you ok with that?" [Exh. 1, clip 2, 10:06]. Defendant replied in the affirmative and then, Trooper Cotner said, "Here's what I'm going to do. Verify the VIN and stuff," to which Defendant responded, "The VIN number?" [Exh. 1, clip 2, 10:20]. Trooper Cotner said, "Yeah, and look inside," to which Defendant responded that he had checked "everything" at the time he purchased the vehicle [Exh. 1, clip 2, 10:22]. Then, Trooper Cotner asked a fourth time, "But you're good with a search? You're good with me searching?" and Defendant said, "Yes, sir" [Exh. 1, clip 2, 10:28].

The Court finds that a reasonable person would have understood this exchange as Trooper Cotner asking to verify the VIN and to search Defendant's vehicle for illegal drugs, guns, and currency. Although Trooper Cotner said he was going to verify the VIN, he also said he wanted to look inside the vehicle, to confirm that it contained items that matched Defendant's account of returning to his home in New York after a week of construction work in Texas, and to look for items ("stuff") other than the VIN. Defendant agreed with these requests.

Our appellate court addressed a similar situation in *United States v. Guajardo*, 388 F. App'x 483, 490–91 (6th Cir. 2010). There, the officer asked defendant, who had no driver's license, if the car contained anything illegal, such as alcohol or guns, or if defendant was a drug-user, all of which defendant denied. *Id.* at 490. The officer then explained to defendant that individuals sometimes claim to have no identification to avoid providing their true identity and asked defendant if he could search the vehicle for "ID and stuff[.]" *Id.* The court rejected defendant's argument that his consent was limited to a search for identification, concluding the officer's questions about any illegal items "informed the defendant of the wide-ranging objects of the requested search." *Id.* at 490–91. By consenting to a search of the vehicle without limitation, defendant gave consent to a general search of any area or container that could contain contraband, including closed containers of cat litter in the trunk. *Id.* at 491; *United States v. Jimenez*, 446 F. App'x 771, 776 (6th Cir. 2011) (determining that by asking defendant if the vehicle contained any illegal drugs before defendant gave general consent, the officer informed defendant that the object of the search was illegal drugs); *Garrido-Santana*, 360 F.3d at 576 (finding that the officer's questions on possession of illegal drugs or stolen goods prior to asking for consent informed defendant that the officer would be searching the vehicle for those items).

26

Here, Defendant gave general, unlimited consent to search his vehicle. "[I]t is 'ordinarily' true that 'general consent [to a search] permits the opening of closed but unlocked containers found in the place as to which consent was given' even 'where officers did not tell the suspect the object of their search.'" *United States v. Canipe*, 569 F.3d 597, 605 (6th Cir.) (quoting *United States v. Gant*, 112 F.3d 239, 243 (6th Cir. 1997)), *cert. denied*, 558 U.S. 1036 (2009). In *Canipe*, the Court held that the officers' questions on whether the defendant had anything illegal in his vehicle put defendant on notice that the officers were looking for illegal items, and defendant's "general consent to search the vehicle reasonably included permission to search any container that might have held illegal objects." *Id.* at 606. Likewise in this case, the Court finds that by questioning Defendant on drugs, firearms, and currency, Trooper Cotner conveyed to Defendant the object of his requested search was to search for those items in addition to checking the VIN. Defendant agreed to the search without limitation. *See Singh*, 2019 WL 2783564, at *4 (observing "it is well settled that the burden of limiting the scope of consent fell on [defendant]" (citing *Jemino*, 500 U.S. at 251)). A reasonable person would have understood that Defendant consented to a general search of his vehicle, including the spare tire storage area.

Thus, the Court finds the troopers did not exceed the scope of Defendant's consent when they searched the spare tire storage area in the rear cargo compartment of the vehicle for drugs.

### 3. Probable Cause to Search the Vehicle

At the evidentiary hearing, the Government addressed—albeit not vigorously—whether Trooper Cotner had probable cause to search Defendant's vehicle in the absence of his consent. While the Court finds Defendant gave voluntary consent to a general search of his vehicle, the Court examines this argument as well and finds it without merit.

27

An officer does not need cause to check a vehicle's VIN. "[A] demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop." *New York v. Class*, 475 U.S. 106, 115 (1986); *United States v. Samuels*, 443 F. App'x 156, 160 (6th Cir. 2011). No reasonable expectation of privacy exists in the VIN, which must be clearly visible from outside the vehicle pursuant to federal law. *Class*, 475 U.S. at 114; *Samuels*, 443 F. App'x at 156. Hence, an officer need not have even reasonable suspicion to inspect the VIN. *Id.* (observing that a VIN check does not unlawfully extend a traffic stop).

Here, Trooper Cotner attempted to check the VIN plate on the dash, but it was covered with a paper. This gave Trooper Cotner reasonable suspicion to check the non-public VIN locations. *See Samuels,* 443 F. Appx at 156 (observing that the vehicle's public VIN showed evidence of tampering, which the officer thought indicated the vehicle may have been stolen). *Cf. United States v. Caro*, 248 F.3d 1240, 1246 (10th Cir. 2001) (holding that an officer may not extend the scope of a detention where the VIN is readable from the outside of a vehicle, matches the VIN listed on the registration, and shows no signs of tampering). Trooper Cotner next checked the VIN in the door seam. While Trooper Cotner did not testify to this fact at the evidentiary hearing, the narrative in his report, which is attached to the Government's response, states the VIN in the driver's side door seam showed signs of tampering and "had a gash in it like someone had attempted to remove it" [Doc. 22-1 p. 5]. This discovery gave Trooper Cotner reasonable suspicion to continue to investigate the VIN. It did not, however, give the troopers reasonable suspicion to search the vehicle for drugs, and the controlled substance ultimately located in the spare tire storage area was not in plain view.[5]

---

[5]     The record before the Court is devoid of any evidence that a VIN could be found in the rear cargo area or the spare tire storage area.

The Court further finds Trooper Cotner did not develop probable cause that the vehicle contained drugs. Despite his testimony that he suspected Defendant of drug trafficking, the factors arguably supporting that suspicion—the temporary license tag, travel from Texas to New York, the short duration of Defendant's trip to Texas, and the fact the insurance paperwork was laminated—did not provide probable cause that the vehicle contained controlled substances.

In summary, the Court finds that Defendant gave voluntary consent for a general search of his vehicle for controlled substances. The undersigned therefore recommends that the District Judge deny the suppression motion.

## IV.    CONCLUSION

The Court finds that the trooper had probable cause to stop Defendant Munoz for a traffic violation and that Defendant gave valid consent for a general search of his vehicle. Accordingly, the undersigned respectfully **RECOMMENDS** that Defendant's Motion to Suppress [**Doc. 19**] be denied.[6]

> Respectfully submitted,
>
> Jill E. McCook
> United States Magistrate Judge

---

[6]     Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to appeal the District Court's order. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir.), *cert. denied*, 555 U.S. 1080 (2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). "[T]he district court need not provide *de novo* review where objections [to this report and recommendation] are [f]rivolous, conclusive, or general." *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (internal quotation omitted). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

29